## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kyle Montagano, being sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") assigned to the Providence, Rhode Island District Office within the New England Field Division. I graduated from UMass Boston in 2010 with a Bachelor of Arts degree in Criminal Justice. I was a police officer with the Bridgewater Police Department from 2013 to 2021. From 2016 to 2021, I was assigned full-time to the DEA as a sworn federal Task Force Officer ("TFO"). I have been a Special Agent with DEA since May 2021. Prior to my assignment to the Providence Office, I attended a sixteen-week-long DEA Basic Agent Training Academy in Quantico, Virginia. While at the academy, I received training in drug enforcement investigations including, but not limited to, drug identification, surveillance, undercover operations, communications, interview and interrogation, confidential source handling, evidence handling, firearms, and case development.

3. As a Special Agent of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code.

4. As a Special Agent and TFO, I have written and/or participated in the execution of numerous search warrants resulting in the seizure of: large quantities of controlled substances; paraphernalia involved in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; and drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.

5. By virtue of my employment as a police officer and assignment as a DEA Special Agent and TFO, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6. Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers. I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

7. I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

8. Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

9. The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations,

conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is probable cause for the requested complaint and does not set forth all of my knowledge about this matter. All times herein are approximate.

## Purpose of the Affidavit

10. I submit this affidavit in support of a criminal complaint against Michael VARGAS-CRUZ ("VARGAS"), charging that on July 1, 2022, he attempted to possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii) & 21 U.S.C. § 846.

## Probable Cause

11. During the week of June 20, 2022, a DEA field office in another state conducted a controlled purchase of 28.2 kilograms of a substance that field-tested positive for the presence of cocaine. DEA investigators in the other state sent a confidential source ("CS-1") to meet with a target in the other state, and the target supplied CS-1 with the 28.2 kilograms. CS-1 has prior convictions for narcotics trafficking and served time in prison. CS-1 is now being paid by the DEA to work as a cooperator. Based on information provided by CS-1 that investigators were able to corroborate in this and other investigations, investigators believe CS-1 to be reliable.

12. Following the controlled purchase, the DEA field office in the other state contacted members of the DEA's Providence Field Office ("DEA Providence"). DEA Providence learned that the 28.2 kilograms of cocaine were to be delivered to an unknown customer in the Boston area who was to pay a transportation fee in exchange for the drugs. The drugs themselves would be provided on consignment. In my training and experience, payment of a transportation or

brokerage fee for drugs that are otherwise delivered on consignment is a common arrangement among drug traffickers.

13.     On or about June 29, 2022, CS-1 received a telephone number, 857-230-6091, for the customer in the Boston area who was to pay the transportation fee and receive the 28.2 kilograms of cocaine. "857" is a northern Massachusetts area code. The phone is a prepaid phone with no subscriber information serviced by T-Mobile. CS-1 received the phone number from the same person who had negotiated with CS-1 to deliver the 28.2 kilograms of cocaine to CS-1.

14.     DEA Providence then directed a confidential source ("CS-2") to pose as the person who would deliver the drugs to the person holding the 6091 phone, later identified as Michael VARGAS-CRUZ ("VARGAS"). Like CS-1, CS-2 has prior convictions for narcotics trafficking and served time in prison. CS-2 is now being paid by the DEA to work as a cooperator. Based on information provided by CS-2 that investigators were able to corroborate in this and other investigations, investigators believe CS-2 to be reliable.

15.     Investigators prepared sham cocaine to look like the real cocaine that had been delivered to CS-1 in the other state. The real cocaine had been wrapped in 24 individual bundles but weighed approximately 28.2 kilograms.

16.     On June 30, 2022, DEA Providence investigators directed CS-2 to contact VARGAS and negotiate the delivery of the 28.2 kilograms of cocaine. The calls were recorded. During these calls, VARGAS agreed to meet CS-2 and to deliver money (VARGAS said he had "fifteen thousand"[1]) in transportation fees for the item CS-2 would deliver. CS-2 told VARGAS s/he would call VARGAS when s/he was approximately an hour away from being ready.

---

[1] All quoted communications in this Affidavit are unofficial translations from the original Spanish-language discussions.

17. On July 1, 2022, at approximately 11:13 a.m., DEA Providence investigators directed CS-2 to contact VARGAS to meet at the South Bay shopping plaza located at 8 Allstate Road, Boston, MA to complete the transaction. CS-2 did so in another recorded call. Investigators were set up at South Bay for surveillance. Investigators equipped CS-2 and the inside of CS-2's vehicle with audio- and video-recording equipment, searched CS-2 for contraband with negative results, and established surveillance at the South Bay shopping center. Investigators placed 24 individual bricks of sham cocaine in CS-2's trunk.

18. At approximately 1:12 p.m., VARGAS contacted CS-2 and advised that he (VARGAS) was at the plaza. At approximately 1:43 p.m., CS-2 contacted VARGAS and advised him CS-2 was on the way.

19. At approximately 2:03 p.m., CS-2 received an incoming recorded phone call from VARGAS asking where CS-2 was. CS-2 said s/he was approximately two minutes away. VARGAS told CS-2 that he was parked near the T-Mobile store inside of the plaza. Investigators moved toward the T-Mobile store and began attempting to identify the vehicle.

20. In another recorded call at approximately 2:15 p.m., CS-2 told VARGAS the type of vehicle CS-2 was driving and said he/she was at the T-Mobile store. Shortly thereafter, investigators saw a Hispanic male, later identified as VARGAS, exit the driver's seat of a black Ford Explorer (registered to a Esther Mary SMOLEY from Braintree, Massachusetts) and enter CS-2's vehicle.

21. During the meeting, which was video- and audio-recorded, VARGAS handed CS-2 an unsealed manila envelope containing bundled money (approximately $15,000, subject to official count). CS-2 told VARGAS the "24 kilos" were in the trunk of CS-2's car and suggested CS-2 take possession of the vehicle, offload the "kilos" and return the car in one hour. VARGAS

declined to take the vehicle and asked said he usually received such items in a suitcase.  CS-2 said the "kilos" were individual kilos and offered to package them up.   VARGAS agreed and CS-2 told VARGAS that CS-2 would package up the cocaine and return in 20 minutes.  VARGAS then took the envelope back and, as investigators watched, returned to his vehicle.  Investigators noted a Hispanic female later identified as Anny Bernalda CANDELARIO sitting in the passenger seat of the Ford Explorer.

22.     Investigators then met with CS-2 at a neutral site, while surveillance units watched VARGAS, who stayed in the Ford Explorer at the plaza with CANDELARIO.  Investigators then placed the 24 bundles of sham cocaine inside three unsealed brown cardboard boxes.  The bundles were visible without opening the boxes.  Investigators put the boxes into the trunk of CS-2's vehicle.

23.     At approximately 2:55 p.m., CS-2 received an incoming recorded phone call from VARGAS asking how long.  CS-2 explained CS-2 was in traffic and would be there in two minutes.  VARGAS told CS-2 he was parked next to a pink truck in the T-Mobile parking lot (a slightly different location from before).

24.     At approximately 3:00 p.m., CS-2 arrived back at the T-Mobile parking lot and parked next to VARGAS.  VARGAS exited the Ford Explorer and went to the driver's window of CS-2's vehicle.  VARGAS handed CS-2 back the manila envelope containing approximately $15,000.  VARGAS asked if the "kilos" were in the back seat.  CS-2 told VARGAS they were in the trunk and opened the trunk for VARGAS.  Investigators saw VARGAS reach into the trunk and retrieve two of the three boxes containing the sham cocaine and place them into the rear passenger seat of the Ford Explorer.  VARGAS returned to CS-2's trunk, took the final box and was placing it in the Ford Explorer as officers moved in to arrest him.  When officers wearing

clothing with the word "POLICE" exited their vehicles, VARGAS turned and ran. Investigators shouted, several times, "police stop running." After approximately thirty yards, VARGAS stopped running and officers took him into custody. At the same time, CANDELARIO exited the passenger seat of the Ford Explorer and attempted to flee but was taken into custody approximately 15 feet from the car.

25. At approximately 3:07 p.m., DEA Providence investigators called the 6091 phone. A cellular telephone located on the driver's seat of VARGAS's car rang. Investigators learned in a post-Miranda discussion with CANDELARIO that she was just released from jail the day prior and did not have a cellular telephone. After a short time, investigators released CANDELARIO.

## CONCLUSION

26. Based on the information set forth above, probable cause exists to believe that Michael VARGAS-CRUZ violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) & 21 U.S.C. § 846, attempting to possess with intent to distribute 5 kilograms or more of cocaine.



Respectfully submitted,

/s/ Kyle Montagano
Kyle Montagano, Special Agent
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 2nd day of July 2022.

_____
Honorable Paul G. Levenson
United States Magistrate Judge
District of Massachusetts